J-S09032-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.J.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: D.D., FATHER | No. 2781 EDA 2016 |

Appeal from the Decree July 21, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at Nos.: CP-51-AP-0000422-2016
CP-51-DP-0002411-2014
FID: 51-FN-002210-2014

BEFORE: SHOGAN, J., STABILE, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED MARCH 22, 2017**

D.D. (Father) appeals from the decree of the Court of Common Pleas of Philadelphia County (trial court), entered July 21, 2016, that terminated his parental rights to his daughter, A.J.D., born in June of 2012. This decree also changed A.J.D.'s goal to adoption.[1] We affirm.

Philadelphia's Department of Human Services (DHS) filed a petition to terminate Father's parental rights to A.J.D. on May 12, 2016. The trial court aptly summarized the events that led DHS to file the petition in its opinion

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The parental rights of S.C., the mother of A.J.D., were also terminated, and this Court addresses her appeal from the court's decree in a separate memorandum.

entered September 29, 2016. We direct the reader to that opinion for the facts of this case.

The trial court held a hearing on DHS' petition on July 21, 2016. Testifying at that hearing, in addition to Father, were Turning Points for Children case managers, Carol Robinson and Sharita Lee. The trial court entered its decree terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b) on July 21, 2016. Father filed a timely notice of appeal and concise statement of errors complained of on appeal on August 19, 2016. *See* Pa.R.A.P. 1925(a)(2)(i). The trial court entered an opinion on September 29, 2016. *See* Pa.R.A.P. 1925(a)(2)(ii).

Father raises the following questions for our review:

1. Did the trial court err in changing the goal to adoption and terminating [Father's] parental rights because [DHS] failed to establish by clear and convincing evidence that [Father] has evidence [sic] a settled purpose of purpose of [sic] relinquishing claim to a child or has refused or failed to his perform [sic] parental duties[?]

2. Did the trial court err in changing the goal to adoption and terminating [Father's] parental rights as [DHS] failed to establish by clear and convincing evidence that the incapacity, abuse, neglect or refusal of [Father] cannot or will not be remedied by [Father][?]

3. Did the trial court err in changing the goal to adoption and terminating [Father's] parental rights because [DHS] failed to establish by clear and convincing evidence that [twelve] months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement continue to exist, and termination would best serve the needs and welfare of [C]hild[?]

4. Did the trial court err in changing the goal to adoption and terminating [Father's] parental rights as [DHS] failed to establish by clear and convincing evidence that termination of parental rights would best serve the needs and welfare of [Child?]

(Father's Brief, at 3).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

Here, the trial court terminated Father's parental rights pursuant to 23

Pa.C.S.A. § 2511(a)(1), (2), (8), and (b). In order to affirm the termination

of parental rights, this Court need only agree with any one subsection of Section 2511(a).  *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).  Requests to have a natural parent's rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

> § 2511. Grounds for involuntary termination
>
> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> \*    \*    \*
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). Further,

> [a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. . . .

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

> In regard to incarcerated persons, our Supreme Court has stated:
>
> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.
>
> \* \* \*
>
> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). If a court finds grounds for termination under subsection (a)(2), a court must determine whether termination is in the best interests of the child, considering the developmental, physical, and emotional needs and welfare of the child pursuant to § 2511(b). In this regard, trial courts must carefully review the individual circumstances for every child to determine, *inter alia*, how a parent's incarceration will factor into an assessment of the child's best interest.

*In re Adoption of S.P.*, 47 A.3d 817, 828, 830-31 (Pa. 2012) (case citations omitted).

To terminate parental rights pursuant to section 2511(a)(1), the person or agency seeking termination must demonstrate through clear and convincing evidence "that[,] for a period of at least six months prior to the filing of the petition, the parent's conduct demonstrates a[] settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).

With respect to section 2511(a)(1), our Supreme Court has held:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 92 (Pa. 1998) (citation omitted). Further,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B, N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008).

"In an appeal from a goal change order, our standard of review is abuse of discretion; we are bound by the facts as found by the trial court unless they are not supported in the record." *In re L.J.*, 691 A.2d 520, 523 (Pa. Super. 1997), *appeal denied*, 699 A.2d 735 (Pa. 1997) (citation omitted).

We have examined the opinion entered by the trial court on September 29, 2016, in light of the record in this matter, and are satisfied that the opinion is a complete and correct analysis of this case. Accordingly, we affirm the decree of the Court of Common Pleas of Philadelphia County that terminated Father's parental rights and changed A.J.D.'s goal to adoption on the basis of the opinion of the Honorable Joseph Fernandes.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/22/2017

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

In the Interest of R.C.S.III, a Minor  :  CP-51-DP-0002410-2014
                :  CP-51-AP-0000623-2016
In the Interest of A.J.D., a Minor   :  CP-51-DP-0002411-2014
                :  CP-51-AP-0000422-2016

                :  FID: 51-FN-002210-2014

APPEAL OF: S.C., Mother     :  2684/2685 EDA 2016
APPEAL OF: D.D., Father     :  2781 EDA 2016

**OPINION**

**Fernandes, J.:**

Appellants S.C. ("Mother") and D.D. ("Father") appeal from the order entered on July 21, 2016, granting the petition filed by the Philadelphia Department of Human Services ("DHS"), to involuntarily terminate Mother's and Father's parental rights to R.C.S.III ("Child 1") and A.J.D. ("Child 2") ("Children") pursuant to the Adoption Act, 23 Pa.C.S.A. §2511(a)(1), (2), (8) and (b). Carla Beggin, Esq., counsel for Mother, and Scott Gessner, Esq., counsel for Father, filed timely Notices of Appeal with Statements of Matters Complained of on Appeal pursuant to Rule 192 (b).

**Factual and Procedural Background:**

The family in this case has been known to DHS since September 28, 2014, when DHS received a General Protective Services ("GPS") report that Mother was living with the Children in a home without utilities, and that Mother smoked marijuana around the Children. The following day DHS visited the home and found that there were no utilities and the home was in foreclosure. DHS developed a Safety Plan and placed the Children with their maternal grandmother. At the time Father, who is the father of Child 2, was incarcerated. On October 14, 2014, DHS learned that maternal grandmother had returned the Children to Mother. DHS obtained an Order of Protective Custody ("OPC") and placed the Children in a foster home. Following a deferred adjudication on October 27, 2014, Child 1 was placed with his father in the home of a paternal aunt. Child 2 was

adjudicated dependent on October 27, 2014, and fully committed to DHS.[1] The trial court ordered Mother and Father for a drug screen, dual diagnosis assessment and monitoring, and for programs at the Achieving Reunification Center ("ARC"). The case was then transferred to a Community Umbrella Agency ("CUA"). On November 6, 2014, CUA developed a Single Case Plan ("SCP"). Mother's and Father's objectives remained to report to the Clinical Evaluation Unit ("CEU") for a drug screen, dual diagnosis assessment and monitoring, and ARC services. On January 5, 2015, CUA visited Child 1 in paternal aunt's home. Paternal aunt's paramour made homicidal threats towards CUA. As a result Child 1 was removed and placed in the foster home with Child 2. On February 23, 2015, Child 1 was adjudicated dependent and fully committed to DHS. Mother was referred for parenting, anger management and drug and alcohol treatment at ARC on March 19, 2015. Father was referred to ARC the same day for parenting. Over the course of 2015, Mother repeatedly tested positive for amphetamines, and attempted to dilute her urine. Mother was ordered to comply with CEU drug screen assessments including three randoms, and provide documentation as to the completion of any programs. Father has repeatedly shown traces of opiates on his drug tests. Father was also ordered to comply with CEU drug screens, complete anger management and provide documentation of his medical condition. Neither was ever rated above moderately compliant by the court. Both parents were ordered to have weekly supervised visits at CUA. Throughout the life of this case Father has been in and out of jail. Neither Mother nor Father has had stable housing. On May 12, 2016, DHS filed petitions to terminate Mother's and Father's parental rights.

The termination and goal change trial was held on July 21, 2016. Mother did not attend the trial, though she had been present at the previous hearing and signed a subpoena on May 31, 2016. Mother's counsel stipulated to the facts alleged in the petition for involuntary termination. (N.T. 7/21/16, pg. 6). The CUA case manager testified that Mother's SCP objectives were to obtain drug and alcohol treatment, attend supervised visitation, obtain housing and successfully complete ARC services. (N.T. 7/21/16, pgs. 15-16). The CUA case manager testified that Mother had told her she was enrolled in drug and alcohol treatment with Solutions in Recovery, and produced a certificate to that effect. However the CUA case manager testified that she was not sure Solutions

---

[1] Father filed an appeal of the trial court's adjudication of dependency on November 26, 2014. The Superior Court affirmed the trial court's decision in a non-precedential opinion on July 7, 2015. In the Matter of A.D., Child, 3574 EDA 2014 (Pa. Super. 2014).

in Recovery even existed, or whether it was an acceptable drug treatment program. (N.T. 7/21/16, pg. 29). The CUA case manager testified that Mother's visits were not productive. Mother brought the Children unhealthy foods, which caused them to vomit and have diarrhea. (N.T. 7/21/16, pgs. 17, 24). Mother also criticized the Children's dancing skills during visits. (N.T. 7/21/16, pg. 18). Mother had not visited in some time because she was hospitalized at Friends Hospital on a "201," but never called CUA to cancel visits or clarify if she would be attending. Mother is currently at the Kirkbride drug rehabilitation facility as an inpatient. (N.T. 7/21/16, pgs. 14-17). The Children separate easily from Mother when visits are over, and are eager to return to their foster parent. (N.T. 7/21/16, pg. 17). There would be no irreparable harm to the Children if Mother's parental rights were terminated. (N.T. 7/21/16, pgs. 18-19). Mother was evicted from her housing in November 2015, and has not had appropriate housing since that time. (N.T. 7/21/16, pgs. 78-79). Mother was referred to ARC several times, and finally completed a parenting class at PAN. (N.T. 7/21/16, pg. 30). Mother did not complete the mental health services at ARC, and was unsuccessfully discharged. (N.T. 7/21/16, pg. 25). The Children look to their foster parent for all their needs. (N.T. 7/21/16, pg. 79). Foster parent pays for day care and summer camp out-of-pocket. (N.T. 7/21/16, pg. 29). The Children look forward to a permanent future with the foster parent, who they see as their "Mommy". (N.T. 7/21/16, pgs. 18, 26, 75).

The prior CUA social worker testified that Father had been imprisoned since December 2015. (N.T. 7/21/16, pg. 63). Prior to his incarceration, Father's objectives had been to complete anger management and parenting at ARC, provide documentation of his medical condition and find appropriate housing. Father also had to comply with CEU drug screens, dual diagnosis and randoms. (See DHS Exhibits 7, 9, 10, 14). Father was discharged from ARC for non-attendance, and had been evicted from a house with no working utilities. (N.T. 7/21/16, pg. 57, 59, 68). Father is currently in jail at the Philadelphia Detention Center. The CUA social worker had contacted the prison social worker and left contact information. Father never contracted the CUA social worker. (N.T. 7/21/16, pgs. 55-56). The prison social worker could not confirm that Father had engaged in any services in prison. (N.T. 7/21/16, pgs. 55-56, 67). Father had claimed in the past to be suffering from lung cancer, and had been ordered by the court to provide documents to verify his cancer diagnosis. Father never provided documents or proof that he had cancer. (N.T. 7/21/16, pgs. 64-65).

Father was present, having been brought from prison for the trial. Father testified that he had completed anger management in prison, and had taken the course a second time to improve his skills even further. (N.T. 7/21/16, pgs. 90-91). This anger management course also included substance abuse treatment. (N.T. 7/21/16, pg. 103). Father gave confusing and inconsistent testimony on his criminal charges, mentioning a drug charge, a violation of probation, a weapons charge, a burglary charge and a charge for receipt of stolen property. (N.T. 7/21/16, pgs. 92-93). He testified he would be released on September 8, 2016, though a number of his charges had not even gone to sentencing. (N.T. 7/21/16, pg. 104). Father testified that he had housing – the same house he had been living in when incarcerated. He did not pay rent on the house, and did not know if Mother still paid rent. (N.T. 7/21/16, pgs. 93-94). Father also testified that his mother had died and left him an appropriate house in her will, but that the rental property was still the place he intended to reunify with his child. (N.T. 7/21/16, pg. 97). Father testified that he still had cancer, but was waiting to see the outcome of the termination trial before seeking treatment. (N.T. 7/21/16, pg. 107). The trial court terminated Mother's parental rights to the Children under 23 Pa.C.S.A. §2511(a)(1), (2), (8) and (b). (N.T. 7/21/16, pgs. 36, 116). The trial court then terminated Father's parental rights to Child 2 under 23 Pa.C.S.A. §2511(a)(1), (2), (8) and (b). (N.T. 7/21/16, pg. 116). The court found that adoption would be in the best interest of the Children, and changed their permanency goals to adoption. On August 19, 2016, Mother and Father filed appeals of the termination and goal change.[2]

**Discussion:**

Mother raises the following errors on appeal:

1. The trial court erred when it found that [DHS] by clear and convincing evidence had met its burden to terminate [Mother]'s parental rights pursuant to 23 Pa.C.S.A. §2511(a).

2. The trial court erred when it found that the termination of Mother's parental rights was in the Children's best interests and that [DHS] had met its burden pursuant to 23 Pa.C.S.A. §2511(b).

3. The trial court erred in changing the permanent placement goal from reunification to adoption.

---

[2] The trial court also terminated the parental rights of Child 1's father on July 21, 2016. This father has not appealed.

Father alleges that the court erred in changing the goal to adoption and terminating Father's parental rights as DHS failed to establish by clear and convincing evidence that:

1. [Father] has evidenced a settled purpose of relinquishing parental claim to [the Children] or has refused or failed to perform parental duties.

2. The incapacity, abuse, neglect or refusal of [Father] cannot or will not be remedied by the parent.

3. [Father] cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the [Children] within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

4. Termination of parental rights would best serve the needs and welfare of the child.

For the purposes of this appeal, Mother's and Father's issues will be consolidated into the following: Did the trial court err in terminating Mother's and Father's parental rights under 23 Pa.C.S.A. §2511(a)(1), (2), (8) and (b) and changing the goal to adoption?

Mother and Father have appealed the involuntary termination of their parental rights. The grounds for involuntary termination of parental rights are enumerated in the Adoption Act at 23 Pa.C.S.A. §2511(a), which provides the following grounds for §2511(a)(1):

**(a) General rule -** The rights of a parent, in regard to a child, may be terminated after a petition is filed on any of the following grounds:

(1) The parent, by conduct continuing for a period of at least six months immediately preceding the filing of the petition, has either evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

In proceedings to involuntarily terminate parental rights the burden of proof is on the party seeking termination, which must establish the existence of grounds for termination by clear and convincing evidence. *In re Adoption of Atencio*, 650 A.2d 1064 (Pa. 1994). To satisfy section (a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. However, the six-month

time period should not be applied mechanically; instead, the court must consider the whole history of the case. *In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). The standard of clear and convincing evidence is defined as testimony that is so clear, direct weighty and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. A parent's incarceration does not preclude termination of parental rights if the incarcerated parent fails to utilize the given resources and to take affirmative steps to support a parent-child relationship. *In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999).

The petitions for involuntary termination were filed on July 12, 2016. Mother's SCP objectives were to attend drug and alcohol treatment, obtain appropriate housing, attend supervised visits and attend ARC for mental health treatment. Mother also had parenting and anger management as objectives. (N.T. 7/21/16, pgs. 15-16), (DHS Exhibits 7, 9, 10, 14). Mother told the CUA case manager that she was enrolled in drug and alcohol treatment with Solutions in Recovery, and produced a certificate to that effect. However the CUA case manager testified that she was not sure Solutions in Recovery even existed, or whether it was an acceptable drug treatment program. (N.T. 7/21/16, pg. 29). Mother is currently at Kirkbride, a drug rehabilitation center in Philadelphia as an inpatient. (N.T. 7/21/16, pgs. 16, 22). Throughout the life of the case, Mother has refused to comply with the court-ordered dual diagnosis assessment. However, Mother has provided drug screens from the CEU with positive results as indicated in DHS's Involuntary Termination Petition. On April 2, 2015, Mother tested positive for amphetamines and opiates; on September 30, 2015, Mother tested positive for amphetamines. On November 12, 2015, and December 11, 2015, she again tested positive for amphetamines. On August 19, 2015, and December 17, 2015, Mother submitted diluted urine drug screens, as evidenced by the creatinine levels. Mother was evicted from her housing in November 2015, and did not have appropriate housing at any point during the six-month period prior to the filing of the petitions. (N.T. 7/21/16, pgs. 78-79). Mother did not complete the mental health services at ARC, and was unsuccessfully discharged. (N.T. 7/21/16, pg. 25). On July 6, 2016, Mother voluntarily admitted herself for depression and was hospitalized at Friends Hospital in Philadelphia. (N.T. 7/21/16, pg. 14). During her hospitalization Mother could not visit with the Children. Mother did not contact CUA to inform them that she was unable to make visits. (N.T. 7/21/16, pgs. 16-17). Mother did visit with the Children prior to her hospitalization, but the visits were not productive. Mother brought

the Children foods that made them ill, and inappropriately criticized their dancing. (N.T. 7/21/16, pgs. 17-18, 24). Mother did not complete any programs at ARC, including anger management. (N.T. 7/21/16, pg. 25). Mother finally completed a parenting class at PAN on August 15, 2015. (N.T. 7/21/16, pg. 30). Looking beyond the six-month period, Mother has never been more than moderately compliant with her objectives. (N.T. 7/21/16, pgs. 15-16). By her own conduct, for a period of at least six months prior to the filing of the petition, Mother evidenced a settled purpose of relinquishing her parental claim since she has failed or refused to perform parental duties. As a result the trial court did not abuse its discretion by finding clear and convincing evidence that DHS met its burden under Section 2511(a)(1). Termination under this section was proper.

The petition for involuntary termination was also filed against Father on July 12, 2016. During the entire six-month period prior to the filing of the petition, Father was incarcerated. (N.T. 7/21/16, pg. 63). The CUA social worker contacted the prison and spoke to Father's assigned prison social worker. The CUA social worker left contact information, but was not able to obtain any information about Father's engagement with programs in prison. (N.T. 7/21/16, pgs. 54-56). Father's SCP objectives were to complete anger management, have visits with Child 2, arrange for appropriate housing, comply with CEU drug screens, dual diagnosis and randoms, parenting and provide documentation about his medical condition. (N.T. 7/21/16, pgs. 57, 68), (DHS Exhibits 7, 9, 10, 14). Father testified that he had completed anger management in prison, and had taken the course a second time to improve his skills even further. (N.T. 7/21/16, pgs. 90-91). This anger management course also covered substance abuse. Father did not produce documents showing that he had actually successfully completed anger management and substance abuse. According to Father he was never involved with drugs and had no history of doing drugs. (N.T. 7/21/16, pgs. 55-56, 100-101, 103). However, prior to his incarceration, Father provded a drug screen from the CEU whereby he tested positive for amphetamines on December 14, 2015, as indicated in DHS's Petition for Involuntary Termination. Throughout the life of this case, Father has refused to comply with the court-ordered dual diagnosis assessment. The CUA worker left contact information for Father, but he never called to explore visits with Child 2. (N.T. 7/21/16, pgs. 54-56). Father admitted he had an option to put the CUA worker's number on his prison call list, but chose not to. (N.T. 7/21/16, pg. 98). Father was court-ordered to have only supervised visits with Child 2, but he testified that Mother would put him on the phone with Child 2. (N.T. 7/21/16, pgs.

98-99). Father testified that he had appropriate housing for his release. He mentioned the house he had been living in when incarcerated, but he did not pay rent on the house, and did not know if Mother still paid rent. (N.T. 7/21/16, pgs. 93-94). Father also testified that his mother had died and left him a house in her will, but that the rental property was still the place he intended to reunify with his child. (N.T. 7/21/16, pg. 97). Father had previously delayed completion of his objectives, claiming he had cancer. Father had been ordered by the court to show CUA written proof of his diagnosis, but had not done so. (N.T. 7/21/16, pgs. 64-65). Father testified that he still had cancer, but was waiting to see the outcome of the termination trial before seeking treatment. (N.T. 7/21/16, pg. 107). Looking beyond the six-month period, Father has never been compliant with court orders or successfully completed all his SCP objectives. Father has not shown that he used the resources of the prison to affirmatively parent Child 2. Father evidenced a settled purpose of relinquishing his parental claim since he has failed to perform parental duties. As a result the trial court did not abuse its discretion by finding clear and convincing evidence that Father, by his conduct, had refused and failed to perform parental duties, so termination under this section was proper.

The trial court also terminated Mother's and Father's parental rights under 23 Pa.C.S.A. §2511(a)(2). This section of the Adoption Act includes, as a ground for involuntary termination of parental rights, the repeated and continued incapacity, abuse, neglect or refusal of the parent that causes the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. This ground is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties, but focuses more specifically on the needs of the child. *Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996).

Mother's SCP objectives were to obtain drug and alcohol treatment, attend supervised visitation, obtain housing and successfully complete ARC services for parenting and mental health. Mother also had parenting and anger management as objectives. (N.T. 7/21/16, pgs. 15-16), (DHS Exhibits 7, 9, 10, 14). Mother was enrolled in drug and alcohol treatment with Solutions in Recovery. However, the trial court heard testimony that Solutions in Recovery may not even exist, and may not be an appropriate treatment facility. (N.T. 7/21/16, pg. 29). Mother is currently at Kirkbride as an inpatient. (N.T. 7/21/16, pgs. 16, 20). Mother has refused to attend the CEU for court-ordered dual diagnosis assessment and has tested positive for amphetamines and opiates,

including providing diluted urine drug screens, as indicated in DHS's Petition for Involuntary Termination. Mother's visits were consistent but not productive. Mother brought the Children unhealthy foods, which caused them to vomit and have diarrhea. (N.T. 7/21/16, pgs. 17, 24). Mother also criticized the Children's dancing skills during visits. (N.T. 7/21/16, pg. 18). Mother had not visited in some time because she was hospitalized at Friends Hospital on a "201," but never called CUA to cancel visits or clarify if she would be attending. (N.T. 7/21/16, pgs. 14-17). Mother was evicted from her housing in November 2015, and has not had appropriate housing since that time. (N.T. 7/21/16, pgs. 78-79). Mother completed a parenting class at PAN. (N.T. 7/21/16, pg. 30). However, Mother did not complete the mental health services or anger management at ARC, and was unsuccessfully discharged. (N.T. 7/21/16, pg. 25). Mother did not appear for the termination trial, though she had signed a subpoena at the previous hearing on May 31, 2016. (N.T. 7/21/16, pg. 6). The Children have been in care since October 14, 2014. During that time, Mother has failed to take affirmative steps to successfully complete her objectives and comply with court orders to place herself in a position to parent the Children. Mother's conduct shows that Mother would be unable to remedy the causes of her incapacity in order to provide the Children with essential parental care, control or subsistence necessary for their physical and mental well-being. The Children need permanency, which Mother cannot provide. Termination under this section was also proper.

Father's SCP objectives were to complete anger management class, visit with Child 2, secure appropriate housing, comply with CEU drug screens, dual diagnosis and randoms, parenting, and provide documentation about his medical condition and substance abuse. Father claims he was never involved with drugs. (N.T. 7/21/16, pgs. 57, 68), (DHS Exhibits 7, 9, 10, 14). Father has refused to attend CEU for dual diagnosis assessment, as ordered by the court. On December 14, 2015, Father tested positive for amphetamines as indicated in DHS's Petition for Involuntary Termination. Father claims he has completed anger management classes, including substance abuse, twice while imprisoned. (N.T. 7/21/16, pgs. 90-91). The CUA case manager has not been able to verify that Father took these classes. (N.T. 7/21/16, pgs. 55-56, 100-101, 103). Father had been unsuccessfully discharged from ARC anger management classes for non-attendance prior to his imprisonment. (N.T. 7/21/16, pg. 57). Father did not visit with Child 2 while imprisoned. He did not contact CUA to inquire about visits. (N.T. 7/21/16, pgs. 55-56). Father chose not to place

CUA's contact number on his prison call list. (N.T. 7/21/16, pg. 98). Instead, he had telephone contact with Child 2 during Mother's supervised visits, without the knowledge of the agency which was court-ordered to supervise his visits. (N.T. 7/21/16, pgs. 98-99). Father claims that he has already secured appropriate housing for his release, which he testified would occur on September 8, 2016. Father's testimony is not credible in two respects. First, Father mentioned a wide variety of criminal charges against him, some of which have not even reached sentencing. (N.T. 7/21/16, pgs. 92-93, 104). Second, Father stated that he intended to reunify with Child 2 in the housing from which he had been evicted in November 2015. (N.T. 7/21/16, pgs. 78-79). He then testified that he had inherited an appropriate house from his mother, who had passed away. (N.T. 7/21/16, pg. 97). Father, at this time, does not have stable housing for reunification, and is still in jail at the Philadelphia Detention Center. Father testified that he still had cancer, but was waiting to see the outcome of the termination trial before seeking treatment. (N.T. 7/21/16, pg. 107). He never produced any documents to show his diagnosis, despite a number of court orders to do so. (N.T. 7/21/16, pgs. 64-65, 76). Child 2 has been in care since October 14, 2014. During that time, Father has failed to take affirmative steps to successfully complete his objectives to place himself in a position to parent Child 2. Father's conduct shows that Father would be unable to remedy the causes of his incapacity in order to provide Child 2 with essential parental care, control or subsistence necessary for her physical and mental well-being. Child 2 needs permanency, which Father cannot provide. Termination under this section was also proper.

The trial court also terminated Mother's and Father's parental rights under 23 Pa.C.S.A. §2511(a)(8), which permits termination when:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

This section does not require the court to evaluate a parent's willingness or ability to remedy the conditions which initially caused placement or the availability or efficacy of DHS services offered to the parent, only the present state of the conditions. *In re: Adoption of K.J.*, 938 A.2d 1128, 1133 (Pa. Super. 2009). The party seeking termination must also prove by clear and convincing evidence that the termination is in the best interest of the child. The best interest of the child is determined after consideration of the needs and welfare of the child such as love, comfort, security

and stability. *In re Bowman*, A.2d 217 (Pa. Super. 1994). See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

The Children in this case have been in DHS care since October 14, 2014. The Children were removed because Mother was unable to parent them, and was living in a house without working utilities. Mother's SCP objectives have remained the same since the start of this case. (N.T. 7/21/16, pgs. 15-16), (DHS Exhibits 7, 9, 10, 14). During the time the Children were in care, Mother has only completed parenting classes. (N.T. 7/21/16, pg. 30). Mother's chosen drug and alcohol treatment facility may not even exist or provide appropriate treatment. (N.T. 7/21/16, pg. 29). Throughout the life of this case, Mother has tested positive for amphetamines and opiates, including providing diluted urine drug screens, as indicated in DHS's Petition for Involuntary Termination. Mother is currently an inpatient at Kirkbride in Philadelphia, a dual diagnosis program. (N.T. 7/21/16, pgs. 16, 22). Mother has never had appropriate housing, and was evicted from housing in November 2015. (N.T. 7/21/16, pgs. 78-79). Mother was unsuccessfully discharged from mental health treatment and anger management at ARC and did not re-engage with mental health services until July 6, 2016. Mother has not successfully completed anger management. On July 6, 2016, Mother voluntarily admitted herself to Friends Hospital on a 201. (N.T. 7/21/16, pgs. 14, 25). Prior to her hospitalization, Mother's visits were not productive. She brought the Children food which made them vomit or have diarrhea. She inappropriately criticized their dancing. (N.T. 7/21/16, pgs. 17-18, 24). Following her hospitalization Mother has not contacted CUA to clarify whether she will be attending visits. (N.T. 7/21/16, pgs. 16-17). Mother had not seen the Children in over a month. The conditions that led to removal of the Children still exist, and Mother is not able to parent them safely at present. The Children are placed with foster parents, and look to these foster parents for all their needs. (N.T. 7/21/16, pgs. 18, 79). The Children call their foster mother "Mommy" and look forward to their future life permanently placed with the foster parents. (N.T. 7/21/16, pgs. 26, 75). The Children separate easily from Mother at the end of visits, and it would be in their best interest to remain with the foster parents, and to terminate Mother's parental rights. (N.T. 7/21/16, pgs. 17, 36, 75). Mother is not ready, willing or able as of today to parent the Children full-time. The conditions which led to the removal of the Children continue to exist, and termination of parental rights would be in the best

interest of the Children. The record contains clear and convincing evidence that the trial court did not abuse its discretion and termination under this section was also proper.

Child 2 has been in DHS care since October 14, 2014. She was removed from Father's care because Father was unable to parent her, and was living in a house without working utilities. Father's SCP objectives were to take anger management courses, visit with Child 2 and secure appropriate housing for his release from prison. Father was also court-ordered to provide CUA with proof of his cancer diagnosis. Father failed to successfully complete ARC anger management or parenting classes, and was discharged for non-attendance. (N.T. 7/21/16, pg. 57). Father cannot actually demonstrate that he took anger management or substance abuse classes while imprisoned. (N.T. 7/21/16, pgs. 55-56, 100-101, 103). Father has refused to attend CEU for dual diagnosis assessment, as ordered by the court. On December 14, 2015, Father tested positive for amphetamines as indicated in DHS's Petition for Involuntary Termination. Father's only contact with Child 2 while imprisoned was unsupervised telephone contact during Mother's visits. (N.T. 7/21/16, pgs. 98-99). He never sought the supervised visitation which the court had ordered. (N.T. 7/21/16, pgs. 55-56). Father chose not to communicate with the CUA worker. (N.T. 7/21/16, pg. 98). Father implausibly claims that he still rents the house from which he was evicted in November 2015. (N.T. 7/21/16, pgs. 78-79). He testified that he would prefer to reunify with Child 2 there, even though he also inherited an appropriate house from his mother. (N.T. 7/21/16, pg. 97). Father has no stable housing and he is still in jail for the foreseeable future. Father testified that he still had cancer, but was waiting to see the outcome of the termination trial before seeking treatment. (N.T. 7/21/16, pg. 107). He never produced any documents to show his diagnosis, despite a number of court orders to do so. (N.T. 7/21/16, pgs. 64-65, 76). Father will not be released from prison until September 8, 2016, according to his own testimony. (N.T. 7/21/16, pg. 104). This date is not credible given the number of criminal charges against Father, many of which have not reached sentencing. (N.T. 7/21/16, pgs. 92-93). The conditions that led to removal of Child 2 still exist, and Father is not able to parent her safely at present. Child 2 is placed with foster parents, and looks to these foster parents for all her needs. (N.T. 7/21/16, pgs. 18, 79). Child 2 calls the foster mother "Mommy" and looks forward to a future life permanently placed with the foster parents. (N.T. 7/21/16, pgs. 26, 75). Child 2 does not want to visit with Father, and refuses to speak with him on the phone. (N.T. 7/21/16, pgs. 61, 65). It would be in her best interest to

remain with the foster parents, and to terminate Father's parental rights. (N.T. 7/21/16, pg. 75). Father is not ready, willing or able as of today to parent Child 2 full-time. The conditions which led to the removal of Child 2 continue to exist and termination of parental rights is in the best interest and welfare of Child 2. The testimony of DHS witnesses was credible as to Mother and Father. The record contains clear and convincing evidence that the trial court did not abuse its discretion and termination under this section was also proper.

After a finding of any grounds for termination under Section (a), the court must, under 23 Pa.C.S.A. §2511(b), also consider what - if any - bond exists between parent and child. *In re Involuntary Termination* of *C.W.S.M.* and *K.A.L.M.*, 839 A.2d 410, 415 (Pa. Super. 2003). The trial court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship". *In re Adoption of T.B.B.* 835 A.2d 387, 397 (Pa. Super. 2003). In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008). In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis depends on the circumstances of the particular case. *In re K.Z.S.* at 762-763. However under 23 Pa.C.S.A. §2511(b), the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical, if found to be beyond the control of the parent.

Prior to her hospitalization, Mother visited the Children regularly, but the visits were unproductive. She brought the Children inappropriate, unhealthy food which caused them to become ill. (N.T. 7/21/16, pgs. 17, 24). Mother criticized the way the Children danced. (N.T. 7/21/16, pg. 18). When visits were over, the Children separated easily, eager to return to their foster parents. (N.T. 7/21/16, pgs. 17). Mother has not visited with the Children or called regarding visits since her hospitalization on July 6, 2016. (N.T. 7/21/16, pgs. 14, 16-17). The CUA case manager testified that there would be no irreparable harm if Mother's parental rights were terminated. (N.T. 7/21/16, pgs. 18-19, 75). The Children are placed in a stable foster home. Though they have only been with the foster parents since May 25, 2016, they already refer to the foster mother as "Mommy" and look forward to a permanent life together. Foster parents provide for all their needs, including daycare and camp, paid out of pocket by the foster parents. (N.T. 7/21/16, pgs. 20, 24, 26). The

foster parents care for all the Children's needs, and the Children look to them for comfort and emotional support. (N.T. 7/21/16, pgs. 26, 75, 79). There is no parent-child bond between the Children and Mother. It would be in the Children's best interest to terminate Mother's parental rights. Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that there was no positive parental bond, and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

Father has not visited Child 2 since he was incarcerated in December 2015. He has not inquired about setting up visits. (N.T. 7/21/16, pgs. 55-56). His only contact with Child 2 is by phone during Mother's visits, unknown to the supervising CUA. (N.T. 7/21/16, pgs. 98-99). Child 2 does not want to visit with Father, and does not want to speak with him on the phone. (N.T. 7/21/16, pgs. 61, 65). There would be no irreparable harm if Father's parental rights were terminated. In fact, termination would be in Child 2's best interest. (N.T. 7/21/16, pgs. 60-61). Child 2 is placed with her sibling Child 1 in a loving foster home with caregivers who provide for all her needs. Child 2 considers the foster mother her "Mommy" and looks forward to a permanent future with the foster parents. (N.T. 7/21/16, pgs. 20, 24, 26, 75, 79). There is no parent-child bond between Child 2 and Father. Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that there was no positive parental bond, and that termination of Father's parental rights would not destroy an existing beneficial relationship.

Mother and Father also allege that the court erred in changing the Children's permanency goal from reunification to adoption. In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873 (Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. *In the Interest Of R.P. a Minor*, 957 A.2d 1205 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply the instructions received. *In re R.T.*, 778

A.2d 670 (Pa. Super. 2001). The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Mother has not successfully completed all her SCP objectives. (N.T. 7/21/16, pgs. 16-17, 24, 25, 29, 78-79). At the time of the trial, Mother was hospitalized for mental health issues and substance abuse she had neglected to address earlier. (N.T. 7/21/16, pg. 14). Mother ignored all court orders to attend programs that would enable her to reunify with the Children. The Children are not bonded with Mother, separating easily from her at the end of visits. (N.T. 7/21/16, pg. 17). Mother is not ready, willing or able to parent the Children at this time. DHS and CUA made reasonable efforts to provide Mother with services. It would be in the best interest of the Children to change their permanency goal to adoption. (N.T. 7/21/16, pgs. 18-19, 36, 75). The Children are placed with foster parents in a safe and stable home. They look forward to a permanent future with foster parents who care for all their needs. (N.T. 7/21/16, pgs. 20, 24, 26, 75, 79). The Children need safety and permanency for their health and welfare.Because these facts were clearly and convincingly established by the testimony of DHS's witnesses, the court's change of permanency goal from reunification to adoption was proper.

Father has not successfully completed his SCP objectives. (N.T. 7/21/16, pgs. 54-56, 57, 64-65, 67, 68). At the time of the trial Father was incarcerated at the Philadelphia Detention Center. Before his re-incarceration, Father was on probation, which he violated when he was charged with additional crimes, whereby he is awaiting sentencing. Father's testimony that he would be released on September 8, 2016, was not credible given the number and nature of these charges. (N.T. 7/21/16, pgs. 92-93, 95, 104). Child 2 does not wish to visit or speak to Father. (N.T. 7/21/16, pgs. 61, 65). Father has not visited with Child 2 since December 2015, and has not explored visits with CUA. (N.T. 7/21/16, pgs. 55-56). Changing Child 2's permanency goal to adoption would be in her best interest. (N.T. 7/21/16, pgs. 60-61). Child 2 is placed with her sibling Child 1 in a loving foster home with caregivers who provide for all her needs. Child 2 considers the foster mother her "Mommy" and looks forward to a permanent future with the foster parents. (N.T. 7/21/16, pgs. 20, 24, 26, 75, 79). Father is not ready, willing or able to parent Child 2 at this time. Child 2 needs safety and permanency for her health and welfare. Because these facts were clearly and convincingly established by the testimony of DHS's witnesses, the court's change of permanency goal from reunification to adoption was proper.

**Conclusion:**

For the aforementioned reasons, the court found that DHS met its statutory burden by clear and convincing evidence regarding termination of Mother's and Father's parental rights pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (8) and (b) since it would best serve the Children's emotional needs and welfare. Changing the Children's permanency goal to adoption was in their best interest. The trial court's termination of Mother's and Father's parental rights and change of permanency goal to adoption was proper and should be affirmed.

By the court,

_____

Joseph Fernandes J.

# IN THE COURT OF COMMON PLEAS
## FOR THE COUNTY OF PHILADELPHIA
### FAMILY COURT DIVISION

| | | |
|---|---|---|
| In the Interest of R.C.S.III, a Minor | : | CP-51-DP-0002410-2014 |
| | : | CP-51-AP-0000623-2016 |
| In the Interest of A.J.D., a Minor | : | CP-51-DP-0002411-2014 |
| | : | CP-51-AP-0000422-2016 |
| | : | |
| | : | FID: 51-FN-002210-2014 |
| | : | |
| APPEAL OF: S.C., Mother | : | 2684/2685 EDA 2016 |
| APPEAL OF: D.D., Father | : | 2781 EDA 2016 |

## PROOF OF SERVICE

I hereby certify that this court is serving, today, September 29, 2016, the foregoing Opinion, by regular mail, upon the following persons:

Jeri Behrman, Esq.
City of Philadelphia Law Dept.
1515 Arch Street, 16th Floor
Philadelphia, PA 19102
Counsel for D.H.S.

Scott Gessner, Esq.
100 S. Broad Street, Suite 1419
Phila., PA 19110
Counsel for Father

Christina Magnus, Esq.
1441 Sansom Street
Phila., PA 12102
Child Advocate

Carla Beggin, Esq.
1800 JFK Blvd. Suite 300
Philadelphia PA 19103
Counsel for Mother

By: _____

Turner N. Falk
Law Clerk to the Hon. Joseph L. Fernandes
Philadelphia Court of Common Pleas, Family Division
1501 Arch St, Room 1431
Philadelphia, Pa. 19102  T: (215) 686-2660